**JS-6**

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> 12-22-2023
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ ts _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| NWHW HOLDINGS, INC., | Case No.: SACV 22-01030-CJC (KESx) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 44] AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 45]** |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A., | |
| Defendant. | |

## I.    INTRODUCTION

In this case, Plaintiff NWHW Holdings, Inc. alleges that Defendant National Union Fire Insurance Company of Pittsburgh, P.A., breached its obligations under Plaintiff's liability insurance policy in denying coverage of defense costs related to a False Claims Act ("FCA") investigation.  (Dkt. 1 [Compl.] ¶¶ 4–5, 26.)  Before the Court are the parties' cross-motions for summary judgment.  (Dkt. 44 [Def.'s Mot. for Summ.

J., hereinafter "DMSJ"]; Dkt. 45 [Pl.'s Mot. for Partial Summ. J., hereinafter "PMSJ"].)
For the following reasons, Defendant's motion is **GRANTED,** and Plaintiff's motion is
**DENIED**.

## II.    BACKGROUND AND MATERIAL UNDISPUTED FACTS

### A.  Plaintiff's Franchise Business and Initial Government Investigation

Plaintiff, through its subsidiary New Horizons Learning Centers ("New
Horizons"), franchises New Horizons Computer Learning Centers.  (Dkt. 52-1 [Def.'s
Reply to Plaintiff's Statement of Genuine Disputes, hereinafter "DSUF"] ¶¶ 1–2.)  New
Horizons earns revenue by charging each franchisee an initial franchising fee and
ongoing royalties, and it provides management and support services to its franchisees.
(*Id.* ¶ 5.)[1]

The Department of Veterans Affairs ("VA") provides financial assistance to
veteran students and makes tuition and fee payments directly to schools on behalf of
enrolled veterans.  *See* 38 U.S.C. §§ 3311, 3313(h).  To receive these payments, each
school must certify that it "has exercised reasonable diligence in meeting all applicable
requirements of Title 38, U.S. Code[,]" ("the GI Bill"), including compliance with the
"Last Payer Rule."  VA Form 22-1999.  Under this rule, schools must report the actual
net cost of tuition for the veteran, after any discounts, scholarships or other deductions
are applied, *see* 38 U.S.C. § 3313(c)(1)(A), ensuring that the government is always the
"Last Payer," funding only the portion of tuition left after all other funding and
reductions are applied.  Plaintiff asserts that it has never directly participated in the VA

---

[1] Plaintiff maintains that "New Horizons' right to royalty payments is not conditioned on providing
'ongoing management and support services.'  New Horizons provides general assistance to franchisees
without charge, but only as it deems appropriate in its sole discretion."  (DSUF ¶ 5.)

Program, but many of New Horizons' franchisees do.  (Dkt. 45-3 [Decl. of Gregory
Marsella, hereinafter "Marsella Decl."] ¶ 5; Dkt. 53-1 [Reply to Def.'s Statement of
Genuine Disputes, hereinafter "PSUF"] ¶ 19.)

On September 13, 2019, the United States Attorney's Office (USAO) for the
Eastern District of Washington served New Horizons with a civil investigative demand
("CID") requesting documents and testimony.  (DSUF ¶ 7.)  This CID was part of an
FCA investigation into whether New Horizons had submitted false claims to the
Department of Veterans Affairs Education Benefits Program ("VA Program") for veteran
students' tuition payments between January 1, 2009 and September 2019.  (*Id.* ¶ 8.)  The
CID requested testimony and documents on a variety of topics, including New Horizons'
"policies, procedures, and practices" regarding various provisions of the Veterans'
Benefits statutes (Title 38).  (Dkt. 44-3 [Decl. of Michael Hartley in Support of Def.'s
Mot. for Summ. J., hereinafter "Hartley Decl."] Ex. E [CID] at 101–02.)

In December 2019, New Horizons learned that its Spokane franchisee had settled
with the USAO and implicated New Horizons as a wrongdoer in its settlement
agreement.  (Marsella Decl. ¶ 6.)  A few months later in February 2020, the owner of the
Spokane franchise confirmed that New Horizons was a "target" of the USAO's
investigation.  (*Id.* ¶ 8.)

**B.  USAO's Presentation**

On September 17, 2020, after New Horizons produced documents and provided
testimony in response to the CID, the USAO gave New Horizons a PowerPoint
presentation (the "Presentation").  (DSUF ¶ 12.)  The Presentation included a slide titled
"THE SCHEME," which alleged that New Horizons had advised its franchisees on how
to violate the GI Bill and knowingly collected royalties from these franchises that were

inflated due to the franchisees' false claims.[2]  (*Id.* ¶ 13.)  The Presentation provided an overview of the Government's investigation and evidence, including a February 14, 2012 email from the Spokane franchise's general manager to the Spokane franchise's owner, among other recipients, referencing New Horizons's National Director of Consumer Sales, Steve Betzold.  (DSUF ¶ 10; Dkt. 28-1 [Presentation].)  In the email, the general manager of the Spokane franchise stated that "per Steve Betzold," the franchise was to deliberately withhold a discount from the VA so the VA would pay more tuition than was actually due for the student.  (*Id.* ¶ 15.)  Later emails from 2015 and 2017 included in the Presentation show New Horizons advising the Spokane franchise to write off remaining unpaid tuition not collected from students as "bad debt."  (Presentation at 121–29; DSUF ¶¶ 17–18.)  Tuition reported as owed but unpaid—i.e., written off as "bad debt"—does not trigger any reduction in the VA's tuition contribution under the Last Payer Rule.  38 U.S.C. § 3313(c)(1)(A).

The Presentation explained that the Government measured its damages by the amount that the United States paid out as a result of false claims, including: (1) reimbursements paid to schools that did not comply with VA requirements, (2) overpayments to schools in response to inflated claims for reimbursement due to violations of the Last Payer Rule, and (3) royalty payments by franchisee schools to New Horizons that were inflated due to false VA claims.  (DSUF ¶¶ 20.)  As to that last category alone, the Government alleged that New Horizons had received over $18 million in royalties paid to it by its franchisees as a percentage of the gross revenues that its franchisees received from VA payments.  (*Id.* ¶ 21.)  At the Presentation's conclusion, the USAO proposed a $39 million settlement, and demanded New Horizons enter a tolling agreement applicable to alleged violations "between January 1, 2011 and the

---

[2] The Presentation also alleges on a more limited basis that New Horizons violated the GI Bill's prohibition on incentivizing enrollments of GI Bill-funded students by providing commissions for securing enrollments.  (*See* Dkt. 28-1 at NEW 000268, 000288; DSUF ¶ 13.)

present" to avoid an immediate filing.  (PSUF ¶ 18.)  Otherwise, the USAO indicated that New Horizons's liability could exceed $500 million with penalties and treble damages.  (*Id.* ¶ 17; Presentation at NEW 000276.)  New Horizons entered into the tolling agreement with the USAO, and since its expiration in 2021, the USAO has not taken further action or made contact.  (DSUF ¶¶ 24–25.)

### C.  This Case

This dispute arises out of Defendant's denial of coverage for expenses related to the Government's CID, Presentation, and tolling agreement that Plaintiff believes should be covered under its insurance policy.  Defendant issued Policy No. 01-933-17-70 (the "Policy") to Plaintiff with a policy period of September 28, 2019 to September 28, 2020.  (DSUF ¶ 26.)  The Policy's Directors, Officers, and Private Company Liability section (the "D&O Section") provides for advancement of defense costs for claims made against the company and a disclaimer that the "Insurer does not assume any duty to defend."  (*Id.* ¶ 27; Dkts. 44-12–14 [hereinafter "Policy"] at NEW 000463–64.)  The D&O Section affords coverage "solely with respect to Claims first made during the Policy Period" that are "reported no later than either: (i) anytime during the Policy Period…; or (ii) within ninety (90) days after the end of the Policy Period."  (DSUF ¶¶ 28–29.)

Plaintiff first sought insurance coverage related to the USAO's investigation on March 20, 2020 when it reported the September 13, 2019 CID.  (PSUF ¶ 9.)  Defendant denied coverage in a letter dated June 8, 2020, asserting that the CID did not constitute a "Claim" as defined in the D&O Policy, that coverage was precluded under the Policy's Franchise Exclusion, and that coverage was precluded under the Prior Acts Exclusion because the CID was examining conduct potentially dating back to January 1, 2009.  (DSUF ¶ 31.)

On September 29, 2020, Plaintiff provided Defendant with a copy of the Presentation and the tolling agreement, (*id.* ¶ 32), and on January 28, 2021, Defendant again denied coverage in a letter—this time taking the position that a claim was made on September 17, 2020 when the Government gave its Presentation, but that coverage was limited by the Government Funding Endorsement and precluded by the Prior Acts Exclusion and the Franchise Exclusion, (*id.* ¶ 62; PSUF ¶ 10). Defendant contends based on extrinsic evidence that the Government Funding Coverage Endorsement includes a $1 million retention provision, indicating Defendant is liable only for defense costs in excess of $1 million, even though the amount of the retention is actually left blank in the Policy. (PSUF ¶ 22.) In its summary judgment briefing, Defendant also argues that the Policy's Professional Services Exclusion applies. (DMSJ at 18–19; *see* DSUF ¶ 49.)

Plaintiff has submitted invoices relating to the Government's investigation totaling $1,448,025.28, of which $165,275.36 was incurred before Plaintiff reported the CID to Defendant on March 20, 2020; $497,754.05 was incurred before Plaintiff provided the Presentation and tolling agreement to Defendant on September 29, 2020; and $948,280.23 was incurred after September 29, 2020. (DSUF ¶ 36.) Defendant has denied coverage entirely. (*Id.* ¶¶ 31–34; *see generally* DMSJ.)

Plaintiff filed its complaint on May 20, 2022, asserting claims for breach of contract and bad faith denial of coverage. (Dkt. 1 [Compl.].) On July 15, 2022, Defendant filed its answer, maintaining its position that Plaintiff's claim does not qualify for coverage under the Policy. (Dkt. 11 [Answer].) The parties agree that the facts relevant to the breach-of-contract claim are undisputed, so both Plaintiff and Defendant moved for summary judgment. (*See* PMSJ at 7; DMSJ at 1.) Plaintiff and Defendant submitted their first cross-motions for summary judgment (Dkts. 26, 29) in July 2023, but the Court denied these motions without prejudice after they had been fully briefed

because the parties had not adequately addressed choice of law.[3]  (*See* Dkt. 42.)  The

parties then submitted renewed motions for summary judgment on October 5, 2023,

(Dkts. 44–45), and the Court held oral argument on the motions on December 7, 2023.

Following the hearing, Plaintiff's counsel—dissatisfied with the manner in which he

answered one of the Court's questions regarding the Government Funding Coverage

Endorsement—submitted a declaration requesting leave to submit supplemental briefing.

(*See* Simon Decl. ¶ 3.)  A week later, the parties each submitted a supplemental brief

addressing the significance of the blank in the Policy's Government Funding Retention

provision.  (Dkts. 61–62.)  Having received four briefs from each party relevant to their

renewed cross-motions for summary judgment, the Court then took the matter under

submission.

## III.    LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of

each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

Summary judgment is proper where the pleadings, the discovery and disclosure materials

on file, and any affidavits show that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial

burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477

U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a

reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v.*

---

[3] At the time, Plaintiff argued that Pennsylvania law should apply partially based on the Policy's listing of Pennsylvania as Plaintiff's state of incorporation.  If Plaintiff had indeed been a corporate citizen of Pennsylvania, this Court would have lacked subject-matter jurisdiction, as Defendant is also a citizen of Pennsylvania.  (*See* Dkt. 38 at 1.)  However, in response to an order to show cause why the case should not be dismissed for lack of diversity jurisdiction (*id.*), Plaintiff acknowledged that the "state of incorporation/formation identified in the policy [was] simply incorrect."  (Dkt. 40 at 2.)  The Court therefore requested that the parties resubmit their summary judgment briefs addressing the choice-of-law in more than footnotes and based on accurate information.  (*See* Dkt. 42.)

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## IV.    DISCUSSION

Plaintiff and Defendant's motions seek summary judgment on the same issues. In sum, Plaintiff contends that Defendant has breached its contractual obligations under the Policy in refusing to provide any coverage for defense costs associated with the USAO's CID and Presentation. (*See* PMSJ at 1.) Defendant asserts, based on the same contractual language, that there is no coverage for these matters under the Policy. (*See* DMSJ at 4.) Defendant also moves for summary judgment on Plaintiff's claim for bad faith denial of coverage since there can be no bad faith if the Court rules that there was no breach of contract. (*Id.*) The Court agrees with Defendant's position and grants its motion for summary judgment. Plaintiff's motion is denied in full.

### A.  Choice of Law

Plaintiff contends that Pennsylvania law should apply to this dispute based on the location of its principal place of business when the Policy was signed, while Defendant contends California law should apply based on where the parties intended the contract to be performed.  "To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum."  *James River Ins. Co. v. Medolac Laboratories*, 290 F. Supp. 3d 956, 963–64 (C.D. Cal. 2018) (citation and quotation omitted); *Fireman's Fund Ins. Co. v. Nationwide Mut. Ins. Co.*, 2012 WL 1985316, *5 (S.D. Cal. June 4, 2012) (same).  In California, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Cal. Civ. C. § 1646.  An insurance policy is a contract.  Cal. Ins. Code § 22.  For liability insurance policies, the parties typically contemplate performance in the jurisdiction where the insured operates its business.  *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1450 (2007).  "If the insured risk involves operations at one or more fixed locations, . . . . a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located," and the insurer typically performs under the policy in that jurisdiction.  *Id.*

As to the conduct at issue in this dispute, the parties contemplated California as the Policy's place of performance.  Although the Policy lists a Pennsylvania mailing address for Plaintiff, (*see* Policy at NEW 000438), Plaintiff's 2019 Policy Application lists Plaintiff's "principal address" as 1900 S. State College Blvd, Suite 450, Anaheim, California.  (DSUF ¶ 51.)  Plaintiff has listed the Anaheim, California address as its corporate address with the California Secretary of State since 2013.  (*Id.* ¶ 54.)  Plaintiff's counsel issued invoices for their services from their San Francisco, California office.  (*Id.* ¶ 53.)  Moreover, the CID addressed Plaintiff at its Anaheim, California address,

(Dkt. 45-6 [CID] at 000176), and the Presentation repeatedly referenced conduct by Plaintiff's executive who listed himself as an employee of the Anaheim office for years in his email signatures, (*see, e.g.,* Presentation at NEW 000279, 000281–82, 000293, 000350). "The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance," *Frontier Oil*, 153 Cal. App. 4th at 1450, and the surrounding circumstances here clearly implicate the parties contemplated coverage of Plaintiff's franchising operations in California.

For Plaintiff's bad faith cause of action, the governing choice-of-law rule is the three-step "governmental interest" test. *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1459 (2007). "[F]irst, the court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000); *see also Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919–20 (2001) ("The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem … if the relevant laws of each state are identical, there is no problem[.]"). "Second, *if the laws do differ*, the court must determine whether a 'true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied." *Id.* (emphasis added). "[I]f more than one jurisdiction has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions.'" *Id.* (cleaned up).

Plaintiff's argument that Pennsylvania law should apply to its bad faith claims fails at the first step of this analysis. Plaintiff acknowledges that California law and Pennsylvania law do not differ in any way material to this dispute (for either cause of action). (PMSJ at 13.) In other words, there is no "material conflict in the law of these two states." *Madera*, 545 F. Supp. at 831; (*see also* Dkt. 50 [Opp'n to PMSJ, hereinafter

"OPMSJ"] at 9).  Therefore, the Court will apply California law to both causes of action.
*See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009) ("Under California's
choice of law rules, California will apply its own rule of decision unless a party invokes
the law of a foreign state that 'will further the interest of the foreign state and therefore
that it is an appropriate one for the forum to apply to the case before it.'").

## B.  Breach of Contract

Insurance policies are contracts to "which the ordinary rules of contractual
interpretation apply."  *Palmer v. Truck Ins. Exch.,* 21 Cal. 4th 1109, 1115 (1999).
Therefore, "the mutual intention of the parties at the time the contract is formed governs
interpretation."  *Id.*  The court infers the parties' intent, "[i]f possible … solely from the
written provisions of the insurance policy."  *Id.* (quoting *AIV Ins. Co. v. Superior Court,*
51 Cal.3d 807, 822 (1990)).  In so doing, the court considers a policy's terms in context
and "interpret[s] words … in accordance with their ordinary and popular sense, unless the
words are used in a technical sense or a special meaning is given to them by usage."
*Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1392
(2008); *see also Palmer,* 21 Cal. 4th at 1115.  "If contractual language is clear and
explicit and does not involve an absurdity, the plain meaning governs."  *Westrec,* 163
Cal. App. 4th at 1392.  For Plaintiff to prevail, the Court must find (1) that there is a
"Claim" under the Policy; (2) that any applicable retentions and coinsurance obligations
are met such that Defendant's coverage obligations are triggered; and (3) that no Policy
exclusions preclude coverage, even if there is a "Claim."

### 1.  A "Claim" Did Not Arise Until September 17, 2020.

For coverage obligations to arise, the Policy's D&O insuring agreement requires
that there be a "Claim," which the Policy defines, in relevant part, as a "written demand

for monetary, non-monetary[,] or injunctive relief (including any request to toll or waive any statute of limitations)."  (DSUF ¶ 38.)  The parties disagree on when precisely the USAO's investigation gave rise to a claim.  Neither party contends that the CID, served on September 13, 2019, in and of itself constituted a claim.[4]  (*See* Dkt. 51 [Opp'n to DMSJ, hereinafter "ODMSJ"] at 12 n.2 ["[T]he CID clearly did not mature into a **Claim** until at the earliest, December 9, 2019, when one of the Government investigators emailed New Horizons' general counsel a copy of its settlement agreement with the Spokane franchisee."].)  And neither party disputes that at least as of September 17, 2020 (when the USAO gave its Presentation), the government's settlement demand constituted a claim because it "sought monetary remedies" in a settlement and nonmonetary relief in the form of a tolling agreement.  (DSUF ¶¶ 20–23.)  The question, then, is at what point between December 2019 and September 2020 a claim arose.

Plaintiff contends in its motion that the government "effectively asserted its **Claim** for monetary relief in December 2019 when it notified New Horizons that the CID was targeting [Plaintiff's subsidiary,] NHCLC, rather than the franchisees who actually participate in the VA Education Benefits Program."  (PMSJ at 15 [emphasis in original].) In that email, the USAO "attached a settlement agreement and accompanying statement of facts from the Computer Solutions of Spokane d/b/a/ New Horizons Learning Center," (Dkt. 45-18 at 2), which stipulated that Plaintiff's "position [regarding veteran tuition payments] was directly contrary to the Last Payer Rule," (Dkt. 45-20 at 11).  Plaintiff argues that the September 2019 CID "plainly indicated the Government's intent to bring a civil claim for monetary relief [under] 31 U.S.C. §§ 3729–3733 … against the [still unidentified] persons who had violated the statute," (PMSJ at 15–16), and a claim then

---

[4] Though Plaintiff previously took the position that a claim arose as of September 13, 2019 when it received the CID, it has since abandoned that argument.  (*See* DSUF ¶ 35.)  If the Court held that the CID as issued on September 13, 2019 constituted a claim, that would actually bar coverage entirely since the claim would then have arisen outside the Policy period, which commenced on September 28, 2019.  *See Evanston Ins. Inc. v. OEA, Inc.*, 566 53d 915, 920 (9th Cir. 2009) ("[B]ecause the claims were made prior to the policy period, they were not even potentially covered").

arose in December 2019 when the government's email made clear that Plaintiff was one of those previously unidentified "persons" who allegedly violated the statute, (PMSJ at 16).

Alternatively, Plaintiff asserts that, if not in December 2019, a claim definitely arose in February 2020 when the Spokane franchisee "confirmed that New Horizons was a 'target' of the investigation." (Marsella Decl. ¶8.)  On the other hand, Defendant argues that neither the USAO's December 2019 email, nor the Spokane franchisee's February 2020 confirmation, transforms the CID into a "claim."  Defendant seeks a judgment that a claim did not arise until September 17, 2020, when the government's Presentation demanded a settlement for damages estimated to be approximately $18 million and a tolling agreement.  (*See* DMSJ at 10.)

Based on the undisputed facts, the Court finds that a claim did not arise under the Policy until September 17, 2020 when the USAO made its demand for monetary relief (a settlement) and nonmonetary relief (a tolling agreement).  To begin, the September 2019 CID, which Plaintiff argues does not independently give rise to a claim but "formed the basis of a claim," (ODSMJ at 11), did not demand monetary, nonmonetary, or injunctive relief from Plaintiff.  (*See* CID at NEW 000177 ["The general purposes for which this Civil Investigative Demand is issued are to discover your knowledge … about any statements, representations, or claims you made or caused to be made to the VA."].)  As a mechanism for requesting nothing more than various forms of information, "a false claims CID is, at its essence, a subpoena issued by an administrative agency."  *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995) (explaining that "a person [who receives a CID] may be required to give oral testimony, answer written interrogatories, produce documents, or all of the above").

Plaintiff contends that "the USAO cannot issue a CID in the absence of plans to … commence a civil proceeding for damages," which means the CID is essentially a veiled request for monetary relief. (PMSJ at 15). But that is incorrect.[5] "A false claims CID may be issued to 'any person' having information 'relevant to a false claims law *investigation*.' 31 U.S.C. 3733(a)(1)." *Markwood*, 48 F.3d at 976 (emphasis added). The statute does not indicate that every investigation must lead to the filing of a claim. Indeed, the CID here stated that it was issued "in the course of a False Claims Act investigation to determine *whether* there is or has been a violation of 31 U.S.C. § 3729." (CID at NEW 000176 [emphasis added] [indicating the government *may or may not* actually file charges].) Moreover, the fact that a CID may be issued to "any person" with relevant information means that many persons will receive CIDs who are not suspected of any wrongdoing but merely have some knowledge of the investigation's subject.

The CID did not demand any monetary payment or anything else besides information, and it did not allege against Plaintiff any particular wrongdoing. (*See* CID at NEW 000177.) It merely requested discovery in various forms to aid the USAO's determination of whether Plaintiff or its franchisees had submitted false claims. That is not a demand for monetary or nonmonetary relief as defined in the Policy. *See, e.g., Diamond Glass Companies, Inc. v. Twin City Fire Ins. Co.*, 2008 WL 4613170, at *2 (S.D.N.Y. Aug. 18, 2008) (holding, based on policy defining "claim" as a "written demand for monetary damages or non-monetary relief commenced by the receipt of such demand," that "the ordinary and accepted meaning of the word 'relief' and the context in which is it used in the Policy [make] clear that investigative subpoenas and search warrants are not 'demands for non-monetary relief'"); *BioChemics, Inc. v. AXIS Reinsurance Co.*, 924 F.3d 633, 637, 640 (1st Cir. 2019) (holding that SEC subpoenas

---

[5] Indeed, Plaintiff's tolling agreement with the USAO expired in 2021, and the USAO has not taken further action or made contact since. (DSUF ¶¶ 24–25.)

were "requests made of a party for information" and thus were not "written demand[s] against an Insured for monetary or nonmonetary relief").

Adding the government's December 2019 email to Plaintiff or the Spokane franchisee's February 2020 confirmation that New Horizons was a target of the investigation does not change this analysis. These communications did not purport to revise the CID or to notify Plaintiff of charges against it. The email and the meeting with the Spokane franchisee merely facilitated Plaintiff's "realiz[ation] … that the CID really was focused on building a case against New Horizons," whereas before, Plaintiff was unsure whether or not the USAO believed it contributed to violations of the GI Bill. (PMSJ at 9.) But Plaintiff's understanding of whether it was suspected of wrongdoing does not transform the CID into a "written demand for monetary, non-monetary[,] or injunctive relief …." (DSUF ¶ 38.) "[T]he mere possibility that an investigation may lead to a formal allegation of [wrongdoing] is not sufficient to constitute a Claim." *First Horizon Nat'l Corp. v. Houston Cas. Co.*, 2017 WL 2954716, at *10 (W.D. Tenn. June 23, 2017). The policy in *First Horizon* also defined a "claim" as "any written demand for monetary, non-monetary or injunctive relief," among other more expansive definitions than are at issue here. *Id.* at *7. In that case, the insured received CIDs requesting documents, interrogatory responses, and depositions, and the court did not consider the CIDs "claims" under any of that policy's possible definitions. *Id.* at *2, *10.

Likewise, the Policy's definition of a "claim" here simply does not incorporate any measure of subjective interpretation. Accepting Plaintiff's position that post-hoc communications transformed the CID into a claim would require the Court to read a subjective element into the Policy's definition that is not there. But "implied terms should never be read to vary express terms." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 803 (1995). "Plaintiff['s] subjective understanding of whether a lawsuit

would result is irrelevant in evaluating whether the written communication constituted a Claim under the terms of the Policy." *First Horizon Nat'l*, 2017 WL 2954716, at *13.

It was not until the September 17, 2020 Presentation that the USAO actually alleged Plaintiff violated the FCA and made a written demand for both monetary and nonmonetary relief. Defendants are correct that this was the first time a "claim" arose under the Policy.

## 2. The Government Funding Coverage Endorsement Applies, Including Its $1 Million Retention.

The parties also seek summary judgment as to whether the Government Funding Coverage Endorsement applies. This provision is critical because it sets a minimum threshold of costs that must be incurred to trigger a coverage obligation and an upper limit on the amount of coverage Defendant will provide once that threshold is met. The Government Funding Coverage Endorsement modifies the D&O section and provides that "Loss [as defined in the Policy] shall also not include the return of funds which were received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds[,]" but the "policy shall pay Defense Costs" for "Claims for Wrongful Acts arising out of the return, or request to return[,] such funds ('Government Funding Claims')": (a) in excess of the Government Funding Retention, which must be "borne by" the Insured; (b) subject to 50%/50% coinsurance for Defense Costs in excess of the Retention; and (c) up to the maximum of $1 million. (DSUF ¶¶ 43–45.)

The Policy also provides that defense costs "shall not include any fees, costs or expenses incurred prior to the time that a Claim is first made against an Insured" and that notice is "a condition precedent to the obligations of the Insurer under this policy,"

(DSUF ¶¶ 39–40).  In other words, defense costs incurred without Defendant's prior written consent (i.e., pre-reporting) are not considered coverable "Loss" under the Policy. (*Id.* ¶ 41.)  The Court has ruled that a claim arose on September 17, 2020 when the government made a request for monetary and nonmonetary relief in its Presentation, and Plaintiff reported that claim to Defendant on September 29, 2020.  (*Id.* ¶ 32.)  As a result, the relevant fees and costs for coverage purposes are those that Plaintiff incurred after September 29, 2020—after the USAO made its demands and after Plaintiff notified Defendant of those demands.  Although Plaintiff's total expenses related to the USAO's investigation total nearly $1.5 million, only $948,280.23 in defense costs were incurred after September 29, 2020.  (DSUF ¶ 36.)

Defendant contends that this Endorsement applies here because the claim arises out of the government's request for return of funds attributable to franchisees' false claims for VA funding.  Defendant further argues that the Endorsement incorporates a $1 million Retention, which would defeat Plaintiff's claim for coverage as it has not incurred sufficient costs to surmount the Government Funding Retention since it reported its claim on September 29, 2020.  Plaintiff, on the other hand, argues that this Endorsement cannot apply to its claim because it never directly received any payments from the VA and that, even if the Endorsement applies, the parties "never agreed to a $1 million retention …." (Dkt. 62 [Pl.'s Suppl. to Renewed Mot. for Summ. J., hereinafter "Pl. Supp."] at 4.)  The Court will address each of these issues in turn: first, whether the Endorsement applies; and second, the amount of the Retention.

### i.    The Endorsement Applies.

First, Plaintiff misconstrues the "arising out of" wording in the Endorsement.  The Endorsement broadly applies to any Claim involving the return of funds "received from" the Government.  It does not require that the funds be received "by" an Insured rather

than through others (i.e., via royalties on the Government's payments to Plaintiff's franchisees).  *See United States v. Ruiz*, 589 F.3d 1310, 1313–14 (10th Cir. 2009) (rejecting the argument that the phrase "received by the insurance department" required that the insurance department itself receive funds rather than through others, because that "would produce absurd results" based purely on who received the money first).

Plaintiff also argues that an action brought under the FCA as a matter of law does not seek the "return" of funds since a violator of the FCA may be held liable only "for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a).  Plaintiff argues that damages cannot constitute a "return" of funds since, in legal terminology, that would be considered restitution.  (PMSJ at 20.)  Plaintiff cites several cases holding that restitution is not a remedy authorized by the FCA.  *See, e.g., Astellas US Holding, Inc. v. Fed. Ins. Co*., 66 F.4th 1055, 1074–76 (7th Cir. 2023); *U.S. ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *7–8 (S.D.N.Y. Nov. 4, 2005).  But whether the FCA authorizes the particular legal remedy of restitution does not control the Court's interpretation of the Policy according to its plain language.  "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its **plain meaning** or **the meaning a layperson would ordinarily attach to it.**" *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995) (emphasis added).

"FCA matters fall within the plain meaning of the 'return of funds received,' because the Government is seeking to 'reacquire funds it allegedly wrongfully paid' for the false claims that were submitted." *SavaSeniorCare, LLC v. Starr Indem. & Liab. Co.*, 2021 WL 4429088, at *7 (N.D. Ga. Sept. 27, 2021) (granting summary judgment based on identical endorsement).  What matters under the Endorsement is whether the government seeks a return of the funds it paid out because of fraud, and that is exactly

what the USAO sought to do here.  The Government directly traced its losses to the
inflated royalty payments New Horizons received because of the false claims it allegedly
directed its franchisees to submit.  (*See* DSUF ¶¶ 20–21.)   Indeed, "[r]egardless of the
name applied by the government to the relief it [seeks] in … FCA Actions, it [is]
attempting to recover funds paid" because of the insured's alleged … fraud."  *Id.; see
also United States ex rel. Roby v. Boeing Co.*, 73 F. Supp. 2d 897, 906 (S.D. Ohio 1999)
("Damages under the FCA are intended to 'provide for restitution to the government of
money taken from it by fraud.'").

Other courts have similarly construed comparable language.  For example, in the
*SavaSeniorCare* case cited above, the insured argued that essentially the same limitation
at issue here did not apply because "when the government filed its consolidated
complaint …, the pleading sought 'damages' and 'treble damages' under the FCA" and
therefore, "the government was not seeking the 'return of funds received.'"  2021 WL
4429088 at *7.  The court rejected Plaintiff's argument, holding that even "interpreting
the Government Funding Sublimit's exclusion from the definition of Loss narrowly, it is
still clear from the sublimit's language that it applies to more than just instances in which
the government attempts to recoup through CMS audit/recovery procedures amounts
wrongfully paid.  **It applies to any processes and claims the government might use to
obtain the return of funds—such as FCA claims**."  *Id.* (emphasis added).

The USAO's Presentation alleging Plaintiff's wrongdoing clearly arises out of the
government's goal to be compensated for its loss.  It is of no consequence that Plaintiff
did not directly contract with the government in causing the loss.

### ii.    The Endorsement Includes a $1 Million Retention.

In the Policy, the field for the dollar amount of the Government Funding retention

is left blank.  (DSUF ¶ 44; Policy at NEW 000552 ¶ 2 [including in the Retention provision a dollar sign with no monetary amount written in].)  "[O]ften, scrivener's errors occur in limits of liability, location schedules, and endorsements that are specially prepared for a particular insured.  As examples, a policy drafter may include an incorrect limit of liability, fail to exclude a particular location that was not intended to be covered, or inadvertently omit a policy exclusion.  Courts have recognized that scrivener's errors 'are difficult to prevent' and, more importantly, that 'no useful societal purpose is served by enforcing ... mistaken term[s][,]'" Scott G. Johnson, *It's A Mistake! Correcting Scrivener's Errors in Insurance Contracts*, Brief, Spring 2015, at 32, which is why "a typographical error in a written contract [may] be corrected by parol evidence if the evidence is clear, convincing and precise," *Farrar v. Am. Nat'l Prop. & Cas. Co.*, 2019 WL 2369930, at *2 (E.D. Cal. June 5, 2019) (citing Doctrine of Scrivener's Error, Black's Law Dictionary (10th ed. 2014)); *see also Matter of Beverly Hills Bancorp*, 649 F.2d 1329, 1333 (9th Cir. 1981) ("Reformation or revision on the ground of mutual mistake (the only ground asserted here) requires clear and convincing evidence of the alleged mistake.").  The blank in the Government Funding Coverage Endorsement is one of these common scrivener's errors, and the evidence clearly—indeed, definitively— shows that the parties intended a $1 million retention to apply to this Endorsement.

### a.  The Parties' Intent

Defendant argues the Policy should be reformed because, as currently written, it does not reflect the parties' "true intentions" at the time of formation.  *Farrar v. Am. Nat'l Prop. & Cas. Co.*, 2019 WL 2369930, at *7 (E.D. Cal. June 5, 2019).  Plaintiff does not dispute the parties' mutual intent to include a $1 million retention, but regardless argues (1) that the blank in the Policy should be read to imply that there is no retention (despite the parties' intent when contracting) and (2) that even if the parties intended a $1 million retention to apply, the statute of limitations has run on Defendant's claim for

reformation.  Under California law, "[w]hen, through … mutual mistake of the parties …
a written contract does not truly express the intention of the parties, it may be revised on
the application of a party aggrieved, so as to express that intention …."  Cal. Civ. Code
§ 3399; *see also Navarro v. Mukasey*, 518 F.3d 729, 737 (9th Cir. 2008) ("Under
[California] contract law, we have the power to 'reform' a contract where, due to
mistake, the clear intention of the parties is not reflected in the final agreement.").  "In
reforming the written agreement, a court may transpose, reject, or supply words, but has
no power to make new contracts for the parties.  Rather, the court may only reform the
writing to conform with the mutual understanding of the parties at the time they entered
into it, if such an understanding exists."  *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524
(2002) (citing *Heidlebaugh v. Miller*, 126 Cal. App. 2d 35, 38 (1954), and *Bailard v.
Marden* 36 Cal.2d 703, 708 (1951)) (cleaned up).

    "In determining whether a mutual mistake has occurred, a court may consider parol
evidence."  *Hess*, 27 Cal. 4th at 525 (citing *Chastain v. Belmont*, 43 Cal. 2d 45, 51
(1954)).  "Extrinsic evidence is necessary because the court must divine the true
intentions of the contracting parties and determine whether the written agreement
accurately represents those intentions."  *Hess*, 27 Cal. 4th at 525 (citing *French v.
Brinkman*, 60 Cal. 2d 547, 552–553 (1963)).  "The parties' true intentions . . . are well-
supported by the record."  *Farrar v. Am. Nat'l Prop. & Cas. Co.*, 2019 WL 2369930, at
*7 (E.D. Cal. June 5, 2019) (holding that insurance policy did not embody parties' true
intentions because of scrivener's error based on extrinsic evidence, including pre-contract
communications).

    Defendant states as an undisputed material fact, based on overwhelming evidence,
that the intended amount of the Government Funding Endorsement's retention is $1
million, (DSUF ¶ 44), which bars coverage of Plaintiff's defense costs since the relevant
costs do not exceed $1 million.  Defendant attaches its insurance offer letter to Plaintiff,

Plaintiff's signed directive to Defendant for binding coverage, internal emails regarding Plaintiff's notice of its insurance selection, the binder of insurance information letter, and other deposition testimony demonstrating Plaintiff's intent to purchase this Policy with a $1 million Government Funding Retention.  (*See* Dkts. 44-19 [Directions for Binding the Insured]; 44-20 [Coverage Options Offer] at NEW 005303; 44-21 [Insured's Notice of Coverage Choice]; 44-22 [Binder of Insurance Coverage Letter] at NEW 005313; 44-4 [Rule 30(b)(6) Dep. of NWHW Holdings] at 246:18–251:12.)  Plaintiff does not dispute Defendant's characterization of the content or validity of this evidence.  (*See* DSUF ¶ 44 [responding to Defendant's evidence of $1 million retention only by saying that the "amount of the Government Funding Retention is blank in the Government Funding Coverage Endorsement."].)

In a September 20, 2019 letter from Defendant to Plaintiff, Defendant presented Plaintiff two possible coverage options.  (Dkt. 44-20.)  Both Option 1 and Option 2 included a "GOVERNMENT FUNDING COVERAGE ENDORSEMENT" with a retention of $1 million.  (*Id.* at NEW 005303, 005307.)  One week later on September 27, Plaintiff signed a document directing Defendant to bind Option 1.  (*See* Dkts. 44-22; 44-19 at 250:10–13 ["Q. Is this a direction that was given by the company to Willis to bind Option 1 on the AIG 12 policies that we just saw?  A. That's my understanding, yes."].)  Defendant's internal email the same day confirms that the "client [(Plaintiff)] wishe[d] to bind option 1," which explicitly included the $1 million Government Funding Retention.  (Dkt. 44-21 at 282.)  The binder of insurance confirmation letter issued on October 1, 2019 also includes the $1 million Government Funding Retention.  (Dkt. 44-22 at NEW 005313.)  Each of these documents highlights in yellow the Government Funding Coverage Endorsement as a "NEW" addition to the Policy.  (*See* Dkt. 44-20 at NEW 005303, 005307; Dkt. 44-22 at NEW 005313.)  And Plaintiff's 30(b)(6) testimony confirms that it intended to bind Option 1 as presented in the September 20, 2019 email,

including the $1 million Government Funding Retention.  (Dkt. 44-4 at 246:18–251:12 ["I believe the company selected Option 1."].)

Ultimately, Plaintiff does not genuinely dispute that it intended to purchase an insurance policy with the $1 million Government Funding Retention, as the evidence clearly shows.  (*See* DSUF ¶ 46.)  Even following the summary judgment hearing, Plaintiff's counsel did not dispute the parties' mutual intent at the time of signing; rather he submitted his declaration to say that he "failed to mention [at the hearing] that the amount of the Government Funding Retention is blank" and requested the opportunity to submit supplemental briefing on the legal implications of this typo. (Simon Decl. ¶¶2–3.) Plaintiff argues in supplemental briefing that "National Union failed to provide any evidence in support of its late argument that New Horizons, the insured, intended to pay a retention amount of $1 million.  The language of the Policy clearly and explicitly indicates that National Union 'shall be liable for **Defense Costs** arising from such **Government Funding Claim** which are in excess of a retention amount of $ .'  There is no evidence, much less evidence that is clear and convincing, that New Horizons reasonably understood that blank to mean anything other than that the policy contained no retention amount."  (Pl. Supp. at 4 [emphasis in original].)

Plaintiff addresses almost none of the evidence that Defendant has submitted and does not acknowledge that its supplemental briefing contradicts its prior positions, including under oath testimony. In the statements of fact supporting the parties' cross motions for summary judgment, Plaintiff never disputed that the parties intended the Government Funding Coverage Endorsement to include a $1 million retention.  For example, Defendant stated that "Plaintiff gave its order to bind the Policy with a $1M Government Funding Retention, and National Union issued its Binder of Insurance Confirmation Letter with a $1M Government Funding Retention."  (DSUF ¶ 46.) Plaintiff disputed this statement only "to the extent [it] implie[d] the Government

Funding Retention applies." (*Id.*)  Plaintiff did not dispute that it ordered Defendant to bind the Policy with a $1 million retention.  Moreover, Plaintiff's argument flies in the face of its 30(b)(6) testimony, in which its corporate representative admitted that Plaintiff selected "Option 1" as presented in the September 20, 2019 email, (Dkt. 44-4 at 246:18–251:12), which plainly included the $1 million Government Funding Retention.  And Plaintiff bases its belated argument that the Policy blank should be filled in with a zero on no evidence at all.

It is well settled that "the mutual intention of the parties at the time the contract is formed [must] govern[ the Court's] interpretation," *Palmer*, 21 Cal. 4th 1109, 1115, 988 P.2d 568 (1999).  Here, the parties' mutual intent at the time of contracting is clear: the parties intended the Government Funding Coverage Endorsement to include a $1 million retention.

### b.  Statute of Limitations and Tolling

This leaves only Plaintiff's further belated argument that contract reformation is time-barred.  Plaintiff contends that "[f]or the first time ever, National Union cites California Civil Code § 3399," explicitly requesting reformation, and therefore its claim for reformation "is time barred ...."  (Pl. Supp. at 2).  Under California law, "an action for relief on the ground of fraud or mistake" is subject to a three-year statute of limitations, which accrues at the time of "discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  Cal. Civ. Code § 338(d).  According to Plaintiff, Defendant should have sought reformation back in June 2020 when it first denied coverage, which was over three years before December 14, 2023 when Defendant filed its supplemental brief explicitly asking the Court to reform the Policy.  Plaintiff's argument fails for several reasons.

First, Plaintiff has waived its statute-of-limitations defense by not raising it in any regular briefing related to the cross-motions for summary judgment (or at the hearing on those motions), instead belatedly requesting the opportunity to submit supplemental post-hearing briefing.  Plaintiff's representation that the issue of interpreting the "blank in the Government Funding Endorsement" was not raised or "briefed by the parties," (Simon Decl. ¶ 2), is plainly incorrect.  Defendant plainly and repeatedly raised the issue of interpreting the blank in the Endorsement to include a $1 million retention—in its answer and in both its motions for summary judgment, which contained explicit arguments that the Endorsement applied and that Plaintiff had not met the required $1 million retention to trigger coverage obligations.  (*See, e.g,* DMSJ at 13 [including a bolded, underlined heading that reads "**Defense Costs Incurred After September 29, 2020 Do Not Exceed the $1M Government Funding Retention.**"]; Dkt. 29-1 at 13 [same].)  Yet Plaintiff never made a statute-of-limitations argument.

"When a party moves for final summary judgment on an issue, the nonmoving party must raise in their opposition all arguments or defenses which would preclude judgment in the moving party's favor or else the nonmoving party abandons the argument or defense." *Williams v. Univ. Med. Ctr. of S. Nev.*, 2010 WL 3001707, at *2 (D. Nev. July 28, 2010) ("[T]he Court concludes Defendants have waived the statute of limitations defense for Williams' § 1983 claim.")  Plaintiff ironically seeks to punish Defendant's failure to use particular terminology to request contract reformation, while also seeking to benefit from its own decision not to raise a statute-of-limitations defense in any manner or form until after the summary judgment hearing.  Defendant asserted in its answer, argued in both rounds of summary judgment briefing, and made clear in its statement of undisputed facts that the $1 million Government Funding Retention barred coverage of Plaintiff's claim.  (*See, e.g.,* Answer at 7; Dkt. 26-1 at 13–15; DMSJ at 13–15; DSUF ¶¶ 34, 44; PSUF ¶¶ 22, 27, 33.)

Plaintiff has been on notice of Defendant's reformation claim—its claim that the Government Funding Coverage Endorsement included a $1 million retention, despite the blank in the Policy—from the beginning of this case and has never once challenged that claim on a statute-of-limitations basis.  It is simply too late for Plaintiff to do it now.

Putting Plaintiff's waiver aside, its statute-of-limitations argument fails on the merits.  Taking as true Plaintiff's assertion that Defendant knew of the mutual mistake in June 2020,[6] it is not correct that Defendant failed to raise this issue until this month.  A request for reformation need not be specifically expressed in the pleadings, and the equitable remedy of reformation may be used by the Court to actualize a pre-existing claim or defense.  *See Base Media Technology Group*, 2023 WL 4316782, at *9 (C.D. Cal. June 9, 2023) (reforming a contract where plaintiff "[i]n seeking this relief, [had] not presented a specific remedial theory that would support its requests").  Contrary to Plaintiff's assertion, magic words are not required.

Adopting Plaintiff's position would yield injustice from a semantic technicality and would redefine the policy in a way the parties never intended.  Although Defendant did not previously use the precise term "reformation," since sending its January 28, 2021 supplemental letter denying coverage, Defendant has consistently and clearly taken the position that a $1 million Government Funding Retention applies to Plaintiff's claim.  (*See* DSUF ¶ 34.)  In its first filing in this case on July 15, 2022, Defendant asserted as an affirmative defense that "[t]he Complaint fails, in whole or in part, to the extent that the applicable Retention under the Policy was not satisfied, and/or to the extent that the Complaint seeks amounts within the applicable Retention."  (Answer at 7.)  The answer

---

[6] Plaintiff offers no evidence that Defendant actually discovered the mistake this long ago.  The Court makes this assumption only on a hypothetical basis to explain that even in Plaintiff's best-case scenario, reformation is not time-barred.  The Court makes no factual finding as to the date on which Defendant discovered the mistake in the Government Funding Coverage Endorsement.

date falls well within the three-year statute-of-limitations period even if the claim for reformation accrued as early as June 2020, as Plaintiff argues.

But more problematic for Plaintiff and its statute-of-limitations defense is well-established law that Defendant's implicit compulsory counterclaim for reformation relates back to the date Plaintiff filed its complaint. "A federal court sitting in diversity applies the substantive law of the state, including the state's statute of limitations. Federal courts must [also] abide by a state's tolling rules, which are integrally related to statutes of limitations." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). California courts have "consistently … held that the commencement of an action tolls the statute of limitations as to a defendant's then unbarred cause of action against the plaintiff, 'relating to or depending upon the contract, transaction, matter, happening or accident upon which the action is brought, …." *Trindade v. Superior Ct.*, 29 Cal. App. 3d 857, 860 (Ct. App. 1973); *see also ZF Micro Devices, Inc. v. TAT Cap. Partners, Ltd.*, 5 Cal. App. 5th 69, 85 (2016), *as modified* (Nov. 30, 2016) (citing Weil and Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 6:592) ("A cross-complaint that is subject-matter related to the plaintiff's complaint (i.e., a compulsory cross-complaint) 'relates back' to when the action was commenced for statute of limitations purposes.")).

Defendant's claim for reformation is timely whether it asserted the claim in its answer or later in moving for summary judgment. Defendant issued the Policy in September 2019. (*See* DSUF ¶ 26.) Plaintiff filed its complaint on May 20, 2022, less than three years later. Even if one assumes that Defendant discovered the scrivener's error immediately upon issuing the Policy in September 2019, which is far earlier in time than Plaintiff contends, Defendant's claim for reformation—whenever asserted in this litigation—would still fall within the three-year limitation period because it was tolled as

of May 2022.  Simply put, Defendant's claim for reformation is timely, and the Court therefore reforms the Policy to include the $1 million Government Funding Retention.

In sum, the Government Funding Coverage Endorsement applies, and extensive, uncontroverted evidence establishes that the Endorsement clearly included a $1 million retention applicable to this dispute.  Given that Plaintiff's defense costs incurred after reporting its claim to Defendant total only $948,280.23, (DSUF ¶ 36), Plaintiff has not incurred defense costs in excess of the applicable $1 million retention.  Consequently, Defendant has no coverage obligation under the Policy to reimburse Plaintiff for any defense costs.

### 3.  The Court Declines to Rule on the Application of Policy Exclusions.

Defendant also asserts that three exclusions bar coverage for Plaintiff's claim: (1) the Prior Acts Exclusion; (2) the Franchise Exclusion; and (3) the Professional Services Exclusion.  Plaintiff contends that none of these exclusions apply.  Since the Court's ruling on the Government Funding Retention conclusively resolves this dispute, the Court need not resolve the parties' disputes regarding these three exclusions.  *See Burke v. Olden*, 2023 WL 4157456, at *2 (C.D. Cal. May 24, 2023) (citing *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 617 n.13 (9th Cir. 2017) ("The 'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.'").

### C.  Bad Faith

Defendant moves for summary judgment on Plaintiff's claim for bad faith denial of coverage contingent upon the Court's ruling that it has no coverage obligations.  Since the Court agrees with Defendant that its coverage obligations under the Policy have not

been triggered based on the date a claim arose and the applicable Government Funding

Retention, Defendant's motion for summary judgment on this claim must also be granted.

"[W]ithout coverage there can be no liability for bad faith on the part of the insurer."

*Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 408 (2000), *as modified*

(July 26, 2000).

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is

**DENIED**, and Defendant's motion for summary judgment is **GRANTED.**

DATED:    December 22, 2023

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE